TENET HEALTHSYSTEMS HOSPITALS, INC. (formerly NME Hospitals, Inc.) d/b/a Palms of Pasadena Hospital, Lake Seminole Hospital, Hollywood Medical Center, and Seven Rivers Community Hospital, Plaintiffs,

v.

Donna E. SHALALA, Secretary, United States Department of Health and Human Services, Defendant.

No. 96–2621 Civ–T–17B.

United States District Court,
M.D. Florida,
Tampa Division.

March 19, 1999.

Joseph P. Donnelly, Greene, Donnelly & Schermer, Tampa, FL, Byron J. Gross, Hooper, Lundy & Bookman, Inc., Los Angeles, CA, for Plaintiffs.

Warren A. Zimmerman, U.S. Attorney's Office, Tampa, FL, Howard H. Lewis, General Counsel's Office, Atlanta, GA, for Defendant.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

KOVACHEVICH, Chief Judge.

This cause is before the Court for consideration of Plaintiff's Motion for Summary Judgment (Dkt.7) and Defendant's Motion for Summary Judgment (Dkt.10).

## STANDARD OF REVIEW

### 1. Motion for Summary Judgment

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(C).

> The plain language of Rule 56(c) mandates that the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue of material fact since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to judgment as a matter of law because the non-moving party has failed to make a sufficient showing on an essential element of the case with re-

spect to which that party has the burden of proof. *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of genuine issues of material fact. *See id.* That burden can be discharged by "showing ... that there is an absence of evidence to support the non-moving party's case." *See id.* at 323, 325, 106 S.Ct. 2548.

Issues of fact are "genuine only if a reasonable jury considering the evidence presented could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *See id.* at 248, 106 S.Ct. 2505.

In determining whether a material fact exists, the court must consider all the evidence in a light most favorable to the non-moving party. *See Sweat v. Miller Brewing Co.,* 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *See Hayden v. First Nat'l Bank of Mt. Pleasant,* 595 F.2d 994, 996–97 (5th Cir.1979) (quoting *Gross v. Southern Railroad Co.,* 414 F.2d 292 (5th Cir.1969)).

Although factual disputes preclude summary judgment, the "mere possibility that factual disputes may exist, without more, is not sufficient to overcome a convincing presentation by the party seeking summary judgment." *See Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). When a party's response consists of "nothing more than a repetition of his conclusional allegations" summary judgment is not only proper but required. *See Morris v. Ross,* 663 F.2d 1032, 1034 (11th Cir.1981), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2303, 73 L.Ed.2d 1306 (1982). In this case, there are no genuine issues as to any material facts, and the issues to be decided are legal in nature.

### 2. Deference to the Secretary's Decision

█ Pursuant to 42 U.S.C. § 1395oo(f)(1), the standard for judicial review of the Secretary's actions is governed by the Administrative Procedure Act, 5 U.S.C.A. § 706. Under that standard of review, considerable weight should be given to an agency's regulations interpreting matters over which the agency is charged to administer. *See Medical Center Hospital v. Bowen,* 839 F.2d 1504, 1510 (11th Cir.1988) (citations omitted); *Chevron U.S.A. v. Natural Resources Defense Council, Inc., et al.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), reh'g denied, 468 U.S. 1227, 105 S.Ct. 28, 29, 82 L.Ed.2d 921 (1984). "Neither a district court nor an appellate court may overturn the Secretary's decision unless it is arbitrary, capricious, an abuse of discretion, not in accordance with the law, or unsupported by substantial evidence in the record taken as a whole." *Carraway Methodist Medical Center v. Heckler,* 753 F.2d 1006, 1009 (11th Cir.1985) (citations omitted).

However, such deference is far from absolute, and the courts of appeal have not hesitated to reverse the Secretary's decisions where they are arbitrary and capricious, inconsistent with the Medicare Act and regulations, or not supported by substantial evidence in the record. *See Sarasota Memorial Hosp. v. Shalala,* 60 F.3d 1507 (11th Cir.1995); *Medical Center Hosp. v. Bowen,* 839 F.2d 1504 (11th Cir. 1988).

### STATUTORY BACKGROUND

The Medicare Act, as part of its health insurance program, provides for reimbursement of the reasonable costs for covered health care services rendered to beneficiaries by providers such as Tenet Healthsystem Hospitals, 42 U.S.C. §§ 1395(c) and (d); these reimbursements are normally paid directly to the providers pursuant to a procedure set out in 42 U.S.C. § 1395(g). Providers enter into

agreements with the Secretary to provide Medicare recipients with health care services, and to charge those recipients only for the statutorily mandated deductible and co-insurance amounts. For other charges, the provider receives payment solely from the Medicare Trust Fund, 42 U.S.C. § 1395cc(a).

The reimbursement program is administered by a fiscal intermediary who is appointed to act as an agent for the Secretary in reviewing claims and overseeing payments. The intermediary is responsible for reviewing reimbursement claims and for determining the provider's actual reasonable costs according to cost accounting regulations promulgated by the Secretary.

The intermediary makes payments to providers under a two-phased structure. The first phase consists of interim payments, based upon estimated costs, made to providers on a monthly basis; the second consists of subsequent adjustments, based upon actual costs, for overpayments and underpayments. 42 U.S.C. § 1395(g); 42 C.F.R. §§ 413.60; and 413.64(f). At the close of the fiscal year, the fiscal intermediary makes a final determination of the provider's reimbursable costs; that determination is based on the provider's actual costs for the fiscal year. 42 C.F.R. §§ 413.60 and 413.20(b). The intermediary must analyze the cost report, conduct an audit if necessary, and furnish the provider with a written notice of program reimbursement ("NPR") setting forth the total amount of reimbursement due under the program. 42 C.F.R. § 405.1803. Such notice must explain how the intermediary reached its conclusions and detail any reasons why the program reimbursement differs from the provider's claim. *Id.*

If the provider is dissatisfied with the intermediary's determination and the amount in controversy is $10,000 or more, the provider may, within 180 days, request a hearing before the Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. § 1395oo; 42 C.F.R. § 405.1841(a). The PRRB has the power to affirm, modify, or reverse a final determination of the fiscal intermediary. 42 U.S.C. § 1395oo(d). Within 60 days after the PRRB renders its decision, the Secretary, acting through the Deputy Administrator of the Health Care Financing Administration ("HCFA"), on his own motion, may reverse, affirm, or modify the PRRB's decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875. The district court has jurisdiction to review the final decision of the PRRB or the Deputy Administrator pursuant to the Medicare Act, 42 U.S.C. § 1395oo(f), and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

## FACTUAL BACKGROUND

Plaintiff is Tenet HealthSystem Hospitals, Inc., (formerly NME Hospitals, Inc.), doing business as Palms of Pasadena Hospital, Lake Seminole Hospital, Hollywood Medical Center, and Seven Rivers Community Hospital. Palms of Pasadena Hospital and Lake Seminole Hospital are located in Pinellas County. Seven Rivers Community Hospital is located in Citrus County. Hollywood Medical Center is located in Broward County. Defendant is Donna E. Shalala, Secretary of the United States Department of Health and Human Services.

The following facts are alleged in the Complaint and are relevant to the issues before this Court:

1. During the fiscal period at issue in this action (the fiscal year ending May 31, 1984), the Hospitals were duly certified as providers of hospital services under the federal Medicare program. (Dkt. 1, Paragraph 4).

2. Defendant, Donna E. Shalala, M.D., the Secretary of the United States Department of Health and Human Services (the "Secretary"), is the federal official responsible for administering the Medicare program. This program is administered through a subdivision of the Department of Health and Human Services

known as the Health Care Financing Administration ("HCFA"). (Dkt. 1, Paragraph 5).

3. From the Medicare program's inception in 1965 until 1983 (when a new "prospective payment system" for inpatient hospital services was established), hospitals were reimbursed the lower of their reasonable costs or customary charges for inpatient services provided to Medicare beneficiaries. 42 U.S.C. § 1395f(b)(1). (Dkt. 1, Paragraph 10).

4. This case involves the fiscal year just prior to the application of the prospective payment system to the four hospitals involved. (Dkt. 1, Paragraph 10).

5. In the Social Security Amendments of 1972, Congress addressed perceived problems of reasonable cost reimbursement by setting limits, known as Section 223 limits, on the amount of reimbursement to hospitals. The Section 223 Limits applied only to a hospital's routine operating costs (i.e., bed, board, and routine nursing care) and were known as routine cost limits. (Dkt. 1, Paragraph 11).

6. In the Tax Equity and Fiscal Responsibility Act of 1982 (known as "TEFRA"), Pub.L. No. 97–248, Congress established new incentives to encourage hospitals to operate more efficiently and economically. These incentives were limits on reasonable cost reimbursements (referred to as "TEFRA limits"). 42 U.S.C. § 1395ww(b). (Dkt. 1, Paragraph 12).

7. Intended to restrain increases in Medicare payments for inpatient hospital services, TEFRA expanded the § 223 cost limits to include ancillary and special care unit operating costs and also established separate "rate-of-increase ceilings" for participating hospitals. *See generally* 42 C.F.R. § 413.40. (Dkt. 1, Paragraph 12).

8. The TEFRA rate-of-increase ceilings are based on a hospital's allowable inpatient operating costs per case incurred in its "base period." 42 C.F.R. § 413.40(b)(1). Using these costs, the Secretary computes a "target amount" for each hospital. For the hospital's initial cost reporting period under TEFRA, the "target amount" was defined as "the allowable costs of inpatient hospital services ... recognized ... for such hospital for the preceding 12–month cost reporting." 42 U.S.C. § 1395ww(b)(3)(A). (Dkt. 1, Paragraph 13).

9. For each cost reporting period after the initial one, the target amount was then increased by a specified percentage. *Id.* (Dkt. 1, Paragraph 13).

10. If a hospital's operating costs exceeded the applicable TEFRA target during a cost reporting period, the hospital was subject to a reduction in the amount of its Medicare Part A reimbursement. 42 U.S.C. § 1395ww(b)(1)(B). Conversely, if the hospital's operating costs were less than the target amount, the hospital received a bonus, calculated as 50% of the difference between the hospital's costs and its target amount, subject to a maximum of 5% of the target amount. *Id.* at § 1395ww(b)(1)(A). *See generally* 42 C.F.R. § 413.40. (Dkt. 1, Paragraph 14).

11. When establishing the TEFRA rate of increase ceilings, Congress also provided for "exceptions" and "adjustments." The exceptions and adjustments were to be provided for by the Secretary "where events beyond the hospital's control or extraordinary circumstances, including changes in the case mix of such hospital, create a distortion in the

increase in costs for a cost reporting period." 42 U.S.C. § 1395(b)(4)(A); 42 C.F.R. § 413.40(g). (Dkt. 1, Paragraph 15).

12. Federal regulations implementing the TEFRA limits were originally found at 42 C.F.R. § 405.463. This regulation provided for an exception to the TEFRA rate-of-increase ceiling if a hospital "can show that it incurred unusual costs (in either a cost reporting period subject to the ceiling or the hospital's base period) due to extraordinary circumstances beyond its control. These circumstances include, but are not limited to, strikes, fire, earthquakes, floods or similar unusual occurrences with substantial cost effects." 42 C.F.R. § 405.463(g)(2). (Dkt. 1, Paragraph 16).

13. The regulations also provided for an adjustment if costs in the base period or in a period subject to the ceiling were not comparable. HCFA may adjust the limits "to take into account factors which could result in a significant distortion in the operating costs of inpatient hospital services. The adjustments include, but are not limited to, adjustments of the base period costs to include explicitly FICA taxes (if the hospital did not incur costs for FICA taxes in its base period), and services billed under Part B of Medicare during the base period, but paid under part A during the subject cost reporting period." 42 C.F.R. § 405.463(h)(1)(i). (Dkt. 1, Paragraph 16).

14. For TEFRA rate-of-increase ceiling purposes, the Hospitals' base year was their fiscal year ending May 31, 1983. The operating costs incurred by the Hospitals and allowable under the Medicare program for the base year were used to compute the TEFRA target amounts which were applicable in future fiscal years. (Dkt. 1, Paragraph 18).

15. The Hospitals' first (and only) fiscal year to which the TEFRA amounts applied were their fiscal years ending May 31, 1984. During that year, The providers were subject to a newly created tax known as the Florida Indigent Care Tax ("FICT"). The Hospitals were originally denied reimbursement for the costs associated with the FICT, when their cost reports for their fiscal years ending May 31, 1984 were audited by their fiscal intermediary, Blue Cross of Florida. (Dkt. 1, Paragraph 19).

16. The Hospitals appealed the denial of the adjustments denying them reimbursement for the costs associated with the FICT, and these appeals were ultimately successful. As a result, on January 31, 1991, the Hospitals received Revised Notices of Program Reimbursement ("NPRs"), granting them additional cost reimbursement for their 1984 fiscal years. (Dkt. 1, Paragraph 19).

17. When NPRs had originally been issued for the 1984 fiscal years, the Hospitals' costs were lower than their TEFRA target limits. As a result, they had received TEFRA bonus payments equal to 50% of the difference between their costs and their TEFRA limits. When the additional reimbursement for the FICT was received, the Hospitals' total costs were still below the TEFRA ceiling. However, because the Hospitals' overall costs were now closer to the TEFRA ceiling, this resulted in a reduction in the amount of the TEFRA bonus. In effect, the additional reimbursement for the FICT was reduced by half. (Dkt. 1, Paragraph 20).

18. On April 10, 1991, the Hospitals submitted a request for adjust-

ments to their TEFRA rate of increase ceilings to account for the imposition of the FICT in their 1984 fiscal year. The Hospitals claimed entitlement to this adjustment, because the FICT was not included in the costs for their TEFRA base year, thus making the costs for the base year not comparable to the costs in the fiscal year 1984. (Dkt. 1, Paragraph 21).

19. If the TEFRA ceilings were adjusted as requested, then the Hospitals' TEFRA bonus payments previously received would remain the same, and the Hospitals would receive full reimbursement for the additional costs won through their successful appeal of the denial of reimbursement for the FICT. (Dkt. 1, paragraph 21).

20. On September 11, 1992, the Intermediary wrote to the Hospitals, enclosing a letter from HCFA, dated July 24, 1992, stating that the Hospitals' request for TEFRA adjustments should be denied for two reasons. First, HCFA claimed that the providers had not filed timely appeals. Second, HCFA relied on 42 C.F.R. § 413.40(g)(1), which provides that a TEFRA adjustment may only be granted if a hospital's operating cost exceeds the TEFRA target limit. (Dkt. 1, Paragraph 22).

21. On November 9, 1992, the Hospitals filed an appeal to the Provider Reimbursement Review Board, appealing the denial of the TEFRA adjustment requests. Subsequent to the filing of the appeal, HCFA and the Intermediary withdrew their jurisdictional objections, acknowledging that the TEFRA adjustment requests were filed in a timely manner. (Dkt. 1, Paragraph 23).

22. The Hospitals and the Intermediary filed position papers with the PRRB, and the matter was then submitted to be heard on the record. On September 5, 1996, the PRRB issued a decision, holding in favor of the Hospitals. The PRRB held that it was improper for the providers' TEFRA adjustment requests to be denied on the basis that their costs were below their TEFRA limits. (Dkt. 1, Paragraph 24).

23. The PRRB noted that, prior to the 1988 revision to the TEFRA regulations which explicitly prohibited TEFRA adjustments when costs were below the TEFRA limits, there was no clear indication that it was HCFA's policy to deny exceptions or adjustments to hospitals which did not exceed their TEFRA limits. The PRRB found that there was no written Congressional or HCFA policy to this effect, and that some adjustments were granted in such situations.

24. Noting that the FICT costs which formed the basis of the Hospitals' TEFRA adjustment requests appeared to warrant a TEFRA adjustment, the PRRB noted that HCFA had not determined whether the Hospitals met all of the requirements for an adjustment request, since the requests had been denied on that basis that the Hospitals' costs were below the TEFRA limits. Thus, the PRRB ordered that the case be remanded to HCFA to determine whether the providers were otherwise entitled to TEFRA adjustments for the FICT. (Dkt. 1, Paragraph 25).

25. The HCFA Administrator elected to review the PRRB's decision. On November 1, 1996, the HCFA Administrator issued a decision, reversing the decision of the PRRB, holding that it was not appropriate to grant a TEFRA adjustment where a provider's operating costs do not exceed the TEFRA rate-of-

increase ceiling. The decision was received by the Hospitals on November 13, 1996. (Dkt. 1, Paragraph 26).

26. The HCFA Administrator's decision was the final decision of the Secretary in this matter. This appeal was filed within the time required by 42 U.S.C. § 1395oo(f). (Dkt. 1, Paragraph 27).

In support of Plaintiffs' Motion for Summary Judgment, Plaintiffs assert the following: (1) The denial of adjustments by the Secretary solely because provider's costs are below its rate-of-increase·ceiling is arbitrary and capricious, and inconsistent with the Medicare Act; (2) Even if the Secretary has the discretion to adopt a policy denying the adjustments solely because a provider's costs are below the limit, there is no basis for concluding that regulations in effect prior to 1988 could be read to include such a policy; and (3) Because providers incurred substantial additional costs as a result of the imposition of the Florida Indigent Care Tax in their 1994 fiscal years (which costs were not incurred during the years on which their rate-of-increase ceilings were based), the Hospitals meet the requirements for either an adjustment or exception to their rate-of-increase ceilings.

In support of Defendant's Motion for Summary Judgment, Defendant asserts the following: (1) Congress intended adjustments and exceptions to TEFRA limits to apply only if a provider's costs exceeded those limits; (2) In the event that the Court finds that Congress has not spoken precisely to this issue, the Secretary's policy is a permissible construction of the statute; (3) Even if the Court finds that Congress has not spoken clearly on this issue and there was no consistent policy, application of the 1988 regulation was appropriate; and (4) Even if this Court were to reverse the decision of the Administrator, this case must be remanded back to the Secretary.

## DISCUSSION

### A. Fairness of Secretary's Decision

■ "In reviewing the Secretary's decisions, both the district courts and appellate courts must abide by those decisions 'unless [they are] arbitrary, capricious, an abuse of discretion, not in accordance with the law, or unsupported by substantial evidence in the record taken as a whole.'" *Alacare Home Health Serv., Inc. v. Sullivan,* 891 F.2d 850, 854 (11th Cir.1990) (quoting *Carraway Methodist Med. Center v. Heckler,* 753 F.2d 1006, 1009 (11th Cir. 1985)). "We previously have noted that the Secretary has amassed considerable expertise in the health care area, and absent a strong showing by the Plaintiff, 'this court will not substitute its judgment for that of the agency.'" *Id.* (quoting *Lloyd Noland Hosp. & Clinic v. Heckler,* 762 F.2d 1561, 1565 (11th Cir.1985)). Although an agency's interpretative rules do not have the force of law, the Secretary's interpretation of her own regulations are "controlling unless plainly erroneous or inconsistent with the regulation." *Shalala v. St. Paul–Ramsey Med. Ctr.,* 50 F.3d 522, 527 n. 4 (8th Cir.1995).

In the present case, the Hospitals have shown that the Secretary's interpretation of the statute is plainly erroneous, and inconsistent with the Medicare regulations. The Hospitals submit that the Secretary's decision in this case is unfair. Their argument consists of three facets: (1) The Secretary's attempt to apply the first step of *Chevron* is not supported by the record; (2) The Secretary's construction does not carry out congressional intent; and (3) The 1988 regulation cannot be retroactively applied.

### B. Application of the *Chevron* Two–Step Analysis and Congressional Intent

Before a court reviews an agency's interpretation of a statute, it must follow the two-step analysis set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778,

81 L.Ed.2d 694 (1984). First, the Court must determine whether Congress has spoken directly to the precise question at issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. Second, if the statute is silent or ambiguous with respect to the specific issue, the court must then determine whether the agency's answer is based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. 2778.

■ In the Hospitals' Motion for Summary Judgment, Plaintiffs contend that the Secretary's attempt to apply the first step of *Chevron* is not supported by the record. The Court agrees. There is nothing on the face of the statute in question that provides that an adjustment or exception only be made when a provider's total costs exceed the TEFRA limit, but not when those costs are below the limit. As 42 U.S.C. § 1395ww(b)(4)(A) clearly states:

> [t]he Secretary *shall* provide for adjustments and exceptions to the TEFRA limit where events beyond a hospital's control or extraordinary circumstances, including changes in the case mix of such hospital, create a distortion in the increase in costs for a cost reporting period. The Secretary may also issue exemptions from, and exceptions and adjustments to, such method as the Secretary deems appropriate (emphasis added).

Congress chose the word "shall" in this statute to make it mandatory for the Secretary to make adjustments and exceptions to the TEFRA limit when a hospital has something unexpected or extraordinary happen that would create a distortion in the costs for their cost reporting period. Therefore, Congress has expressed its intent to recognize unavoidable, but allowable, costs which may be incurred by the Hospitals occurring after the base period, and this intent should be recognized.

## C. Impermissible Retroactive Application of 1988 Regulation

■ In 1988, the Secretary amended her regulations to include the following: "HCFA may grant an adjustment requested by the hospital only if a hospital's operating costs exceed the rate of increase ceilings imposed under this section." 42 C.F.R. § 413.40(g)(1). This policy was not in effect prior to 1988, and should not be applied in this instance. The Secretary's right to adopt regulations and apply them retroactively to reduce provider reimbursement was held to be illegal by the United States Supreme Court in *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). The Secretary has attempted to argue that this change in the statute is merely a clarification of existing policy in order to avoid the issue of retroactive rulemaking. However, the Court does not agree. This regulatory amendment is a change in existing policy, rather than a clarification to the statute. If applied, this would be retroactive rulemaking. Therefore, even though the Secretary can now deny exceptions or adjustments when a provider's costs are below the TEFRA limit, it cannot be applied retroactively in the present case.

## D. Whether Plaintiff is Entitled to Adjustment or Exception

Of particular importance to this litigation is the statutory requirement that the "Secretary provide for an exemption from, or an exception and adjustment to, the [rate-of-increase reimbursement] method where events beyond the hospital's control or extraordinary circumstances create a distortion in the increase in costs for a cost reporting period (including any distortion in the costs for the base period against which such increase is measured)." 42 U.S.C. § 1395ww(b)(4)(A); 42 C.F.R. § 413.40(g)(2). In this case, Plaintiffs seek review of the decision of the HCFA Administrator that they are not entitled to an

"exception" or "adjustment" to its target limit under the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA").

In the present case, the Hospitals do qualify for an adjustment or exception to the TEFRA limit for the fiscal year ending May 30, 1984. The HCFA Administrator ruled against the Hospitals solely on the basis that adjustments cannot be granted if a hospital's costs are below its TEFRA limit. The Administrator did not address whether the imposition of the Florida Indigent Care Tax would otherwise be a valid basis for an adjustment. In 1984, adjustments and exceptions to TEFRA limits were regulated by 42 C.F.R. § 405.463(h) which stated:

> HCFA may adjust the amount of the operating costs considered in establishing cost per case for ... periods subject to the ceiling and the hospital's base period, to take into account factors which could result in a significant distortion in the operating costs of inpatient operating services. The adjustments include, but are not limited to, adjustments to the base period costs to include explicitly FICA taxes (if the hospital did not incur costs for FICA taxes in its base period).

The Hospitals are entitled to an adjustment as a result of the "significant distortion" in their operating costs due to the imposition of the Florida Indigent Care Tax. The statute states that the adjustments include, but are not limited to, FICA taxes. The FICA tax mentioned in the statute merely provides an example of the type of costs which would trigger an adjustment; therefore, the Hospitals should not be denied the adjustment of their operating costs in this instance.

The Hospitals also qualify for an exception under 42 C.F.R. § 405.463(g) because the Florida Indigent Care Tax represents an "unusual cost" resulting from "unusual circumstances" beyond the Hospitals' control. The imposition of the FICT in 1984 was a tax that was not voluntary; it was a mandatory tax imposed on all of the hospitals in Florida. It was not within Plaintiffs' control and it is an unusual cost resulting from unusual circumstances, because the tax was not imposed in the Hospital's base year of 1983.

The Secretary's refusal to grant an adjustment or exception is not reasonable, and is inconsistent with the Medicare statutes and regulations. The record before the Court is sufficient for the Court to issue an order requiring the Secretary to grant the Hospitals' adjustment requests. The Secretary abused her powers under the Medicare program. Accordingly, it is

**ORDERED** that the Plaintiff's Motion for Summary Judgment (Dkt.7) is **granted**, and Defendant's cross-motion (Dkt.10) is **denied.**

**DONE AND ORDERED.**